McDONNELL DOUGLAS CORPORA-
TION and General Dynamics
Corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 91–1204C.

United States Court of Federal Claims.

Dec. 13, 1996.

Caryl A. Potter, III, Sonnenschein, Nath & Rosenthal, Washington, DC, for plaintiff McDonnell Douglas Corporation, with whom was John W. Walbran, McDonnell Douglas Corporation, of counsel; Herbert L. Fenster and David A. Churchill, McKenna & Cuneo, Washington, DC, for plaintiff General Dynamics Corporation.

Bryant G. Snee, United States Department of Justice, Washington, DC, for defendant, with whom was George P. Williams, Office of the General Counsel, Department of the Navy, of counsel.

## OPINION AND ORDER

HODGES, Judge.

In 1988 plaintiffs McDonnell Douglas and General Dynamics contracted with the Navy to develop the A–12, a carrier-based attack aircraft, to replace the Navy's aging A–6. During the course of performance, the contractors experienced numerous problems, particularly with confining aircraft weight growth to the range specified under the A–12 full scale engineering and development contract. By late 1990, they were behind schedule and costs exceeded their estimates. The contractors requested equitable adjustments

totaling $1.401 billion to compensate for impossibility of performance and the Government's failure to disclose superior knowledge. The contracting officer terminated the contract for default on January 7, 1991.

We determined after trial that the Government acted improperly, and we vacated the termination for default. In December 1995 we converted the termination for default to a termination for convenience of the Government. *McDonnell Douglas Corp. v. United States,* 35 Fed.Cl. 358 (1996).

Plaintiffs point out that the Federal Acquisition Regulation entitles them to incurred costs plus a reasonable profit in such circumstances. Defendant argues that the FAR requires us to adjust plaintiffs' cost reimbursement amount downward to reflect the loss that they would have sustained had the contract been completed.

■ The parties seek a trial on damages to resolve plaintiffs' entitlement to profits and defendant's imposition of a loss ratio. Their allegations about the propriety of plaintiffs' superior knowledge claim, and the competing entitlements to profits or a loss adjustment, can be addressed only if both parties are permitted to use information that we have been warned would provoke a formal invocation of the military and state secrets privilege, or cause grave harm to our nation's security interests.[1]

Important information about plaintiffs' claim necessarily will be withheld from plaintiffs' and defendant's litigation teams. Our understanding of this information is sufficient to know that it is necessary to a fair adjudication of plaintiffs' claims or government defenses in certain areas.

We cannot permit the parties to litigate plaintiffs' equitable adjustment claims for three reasons: (1) One party or the other would be unfairly prejudiced due to limitations placed on discovery by the Executive for national security reasons; (2) Highly classified information may be compromised in discovery despite procedures in place to prevent that from happening; and (3) Even if information available to the parties could be protected properly in discovery, other information necessary for the court to render an honest judgment would not be available.

■ For these reasons, issues involving equitable adjustments, superior knowledge, profits, and loss adjustment will not be litigated further in this court. Plaintiffs may recover their incurred and allowable costs plus interest. Defendant may not obtain a loss adjustment pursuant to FAR 49.203, and plaintiffs may not obtain profits pursuant to FAR 49.202. This opinion and a classified appendix to be filed separately with the Federal Circuit address the reasons for this ruling.[2]

## I. Termination for Convenience Damages

When the Government terminates a contract for default, the contractor may not recover its costs for undelivered work, and may have to forfeit any advance or progress payments attributable to that work. FAR 49.402–2. When the Government terminates a contract for its convenience, the contractor "should be compensated fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable amount for profit." FAR 49.201. Typically, the contractor is entitled to recover all its incurred costs and settlement costs, and reasonable profits if warranted. FAR 52.249–2(f). If it appears that the contractor would have suffered a loss on the entire contract, however, the contractor will not obtain a profit, and its cost recovery will be

---

1. The Executive Branch invoked the military and state secrets privilege to remove from this case some evidence related to superior knowledge issues. Separately, General Merrill A. McPeak filed a declaration warning us about unacceptable risks posed by further discovery and litigation concerning superior knowledge.

2. The Executive has been candid and forthcoming in providing materials for the classified appendix. The appendix necessarily compiles disparate but highly sensitive information in one place. It may not be necessary for anyone to review these materials to resolve the legal issues raised by the parties in this lawsuit. The materials would be relevant only for the purpose of reviewing the trial court's decision to remove these matters from the case without the benefit of formal invocations of appropriate privileges in each instance.

reduced corresponding to the rate of loss. *Id.*

When deciding the proper amount of a termination for convenience cost recovery, "[t]he contractor has the burden of establishing, by proof satisfactory to the TCO, the amount proposed." FAR 49.109–7(c). The contractor's proof is submitted in the form of a settlement proposal. FAR 52.249–2(d); FAR 49.104(h). If the Terminating Contracting Officer and the contractor cannot reach a settlement, the TCO must make the determination. FAR 49.103(b); 49.109–7. He must do so, however, in compliance with FAR 49.109–1 through 49.109–6, which govern termination for convenience settlement agreements generally, and FAR 49.203, which requires that the cost recovery be adjusted for any loss. *See also* FAR 52.249–2(f).

## A. Loss Ratio

The Terminating Contracting Officer decides whether to allow a profit or to adjust the recovery for a loss. FAR 49.109–7(a).[3] A loss adjustment reduces a contractor's termination for convenience recovery if the contractor would have sustained a loss on the entire contract. The Terminating Contracting Officer multiplies the incurred costs allowable under the termination for convenience settlement guidelines by a so-called "loss ratio."

3. In a companion opinion discussing plaintiffs' post-complaint claims, we show why the court has assumed the role of the Terminating Contracting Officer at this stage of the proceeding. *See McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 285 (1997).

4. FAR 52.249–2 Termination for Convenience of the Government (Fixed Price) (APR 1984) provides a framework for determining profit or loss when the contractor and the contracting officer cannot reach a settlement:

(f) If the Contractor and Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows ...:

(1) The contract price for completed supplies or services accepted by the Government ... not previously paid for, adjusted for any saving of freight and other charges.

Loss Ration = *(Original Contract Price + Equitable Adjustments)* Estimate at Completion

FAR 49.203(b)(3). Thus, when the Terminating Contracting Officer applies a loss ratio, the contractor receives only a percentage of its allowable costs incurred. A loss ratio begins with an assumption of no profit, and it forces the contractor to bear out-of-pocket costs that otherwise would be paid by the Government.[4] In short, the adjustment always prevents a contractor from receiving credit for all of its allowable costs—funds that it rightfully spent to perform the contract.

■ The boards have found that "the Government generally has the burden of proving entitlement to a loss adjustment, including the estimate to complete as a necessary ingredient thereof. . . ." *Specon Inc.,* ASBCA 29137, 86–3 BCA ¶ 19,163 at 96,855 n.*, 1986 WL 221146; *see also Wolfe Constr. Co.,* ENGBCA 5309, 88–3 BCA ¶ 21,122 at 106,-655, 1988 WL 100976; John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 1129 (3d ed. 1994). The fact that a contract appears to be in a loss position at the time of termination does not necessarily mean that a loss adjustment applies. "It is not appropriate to apply the loss adjustment factor or to limit the settlement to the contract price without giving consideration to unpriced changes or other modifications. . . . However, in some cases the

(2) The total of—

(i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to supplies or services paid or to be paid under subparagraph (f)(1) above;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (i) above; and

(iii) A sum, as profit on subdivision (i) above, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this contract, to be fair and reasonable; however, if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, the Contracting Officer shall allow no profit under this subdivision (iii) and shall reduce the settlement to reflect the indicated rate of loss.

boards will merely ignore the loss adjustment if the contractor is entitled to price adjustments." *Wolfe Constr. Co.*, ENGBCA 5309, 88–3 BCA ¶ 21,122 at 106,655 (finding no loss adjustment when Government maladministration warranted upward adjustment in contract price); *see also Astro Dynamics, Inc.*, ASBCA 41825, 91–2 BCA ¶ 23,807 at 119,209, 1991 WL 38292 (constructive changes by Government to the contract allows plaintiff to recover costs not required under contract and eliminates imposition of loss adjustment); *M.E. Brown*, ASBCA 40043, 91–1 BCA ¶ 23,293 at 116,816, 1990 WL 158914 (same); *R.H.J. Corp.*, ASBCA 12404, 69–1 BCA ¶ 7587 at 35,227, 1969 WL 584 (Government failure to make progress payments contributed to cost enhancement, so no basis for loss); Cibinic & Nash, Administration of Government Contracts 1129 (3d ed. 1994).

█ It is defendant's burden to prove that plaintiffs would have sustained a loss on the entire contract. When the A–12 contract was terminated, plaintiffs' costs had overrun the Government's payment schedule, and much work remained before the aircraft would have been operational. Plaintiffs were in financial distress, the Government argues. Had the contract not been terminated, they would have borne even greater losses. Defendant claims that FAR 49.203 compels plaintiffs to bear these losses.

Plaintiffs' superior knowledge claim alleges that the Government possessed but did not share with the contractors information about low-observable (Stealth) technology. According to plaintiffs, this information included weight estimation techniques, application of low-observable technologies, propulsion system technologies, composite materials and composite manufacturing technologies, and avionics technologies. Timely knowledge about this information, plaintiffs argue, would have enabled them to solve technical problems without conducting extensive, often duplicative efforts at great expense.

If plaintiffs were permitted to prove their superior knowledge claim, defendant likely could not establish the application of a loss ratio. *See Riverport Industries, Inc.*, ASBCA 30888, 87–2 BCA ¶ 19,876 at 100,-522–24, 1987 WL 40948 (contract price increased after plaintiff proved its superior knowledge claim, constituting a constructive change to the contract). Thus, one of plaintiffs' defenses to a loss ratio depends on whether they can prove their superior knowledge allegations.

### B. Profits

█ The Terminating Contracting Officer awards profits to the contractor "on preparations made and work done by the contractor for the terminated portion of the contract but not on the settlement expenses." FAR 49.202(a). The Terminating Contracting Officer may not award anticipatory or consequential profits. *Id.; G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 11, 15–17, 312 F.2d 418, 423, 426–27, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); *General Builders Supply Co. v. United States*, 187 Ct.Cl. 477, 485, 409 F.2d 246, 251 (1969). The TCO must "arrive at a fair profit" by any reasonable method. FAR 49.202(a). No monolithic formula for determining profits is available; the FAR provides an extensive list of discretionary factors for the Terminating Contracting Officer to consider.[5] "Determination of the rate of profit

---

5. FAR 49.202(b) and (c) provide:

(b) In negotiating or determining profit, factors to be considered include—

(1) Extent and difficulty of the work done by the contract as compared with the total work required by the contract (engineering estimates of the percentage of completion ordinarily should not be required, but if available should be considered);

(2) Engineering work, production scheduling, planning, technical study and supervision, and other necessary services;

(3) Efficiency of the contractor, with particular regard to—

(i) Attainment of quantity and quality of production;

(ii) Reduction of costs;

(iii) Economic use of materials, facilities, and manpower; and

(iv) Disposition of termination inventory;

(4) Amount and source of capital and extent of risk assumed;

(5) Inventive and developmental contributions, and cooperation with the Government and other contractors in supplying technical assistance;

(6) Character of the business, including the source and nature of materials and the complexity of manufacturing techniques;

is done on a case-by-case basis and the application of the regulatory guidelines is considered a matter of judgment." Cibinic & Nash, Administration of Government Contracts 1128 (3d ed. 1994) (citing *Metered Laundry Servs.*, ASBCA 21573, 78–1 BCA ¶ 13,206, 1978 WL 2351, *modified on recons.*, 78–2 BCA ¶ 13,451, 1978 WL 2366). Whether to award profit in this case is a matter of discretion for the court.

Plaintiffs argue that once they have proven their superior knowledge-based claim, corresponding equitable adjustments would increase the price of the A–12 contract enough to avoid the imposition of a loss ratio and entitle them to profits. Plaintiffs seek an opportunity to prove their equitable adjustment claims.

Defendant maintains that additional discovery and trial would not support plaintiffs' argument that the Government withheld critical information during performance. The present state of superior knowledge discovery does not verify plaintiffs' allegations, according to defendant. Even if it did, further inquiry into various "black" programs would undermine plaintiffs' argument.

(7) The rate of profit that the contractor would have earned had the contract been completed;
(8) The rate of profit both parties contemplated at the time the contract was negotiated; and
(9) Character and difficulty of subcontracting, including selection, placement, and management of subcontracts, and effort in negotiating settlements of terminated subcontracts.
(c) When computing profit on the terminated portion of a construction contract, the contracting officer shall—
(1) Comply with paragraphs (a) and (b) above;
(2) Allow profit on the prime contractor's settlements with construction subcontractors for actual work in place at the job site; and
(3) Exclude profit on the prime contractor's settlements with construction subcontractors for materials on hand and for preparations made to complete the work.

6. The Government contemplated sharing information with the contractors. "To take advantage of previous technologies developed by the USAF and minimize life cycle costs, the Navy and the Air Force were directed to form a joint committee to minimize duplication of development efforts on the [A–12] and the USAF Advanced Tactical Fighter (ATF)." ATA Acquisition Strategy, NAVAIR Doc. 201//0182–86, 7/12/86, para. I.C. Other evidence supports this assertion

## II. Superior Knowledge

The A–12 was designed to employ low-observable technology to elude enemy radar and defense systems. This technology is highly classified and it remains vital to our nation's security. When the A–12 contract was executed, the Air Force already had conducted flight tests for the B–2 Bomber and the F–117A Fighter through participation with other contractors. Low-observable technology had been applied and tested by 1988, at least according to B–2 and F–117A specifications. The A–12 was designed to apply similar technology.

Plaintiffs were anxious to access B–2 and F–117A program information during contract performance, and they had reason to expect that they would be granted such access.[6] Ultimately they were given access to these programs, but access came too late according to plaintiffs.

Plaintiffs' superior knowledge claim alleges that the Government possessed information that it was required to share for the benefit of contract performance.[7] Through trial and error the Government had learned that certain approaches to the design and develop-

as well. During his deposition, Secretary of the Navy John Lehman remarked:

there was an unquestioned assumption when we started the [A–12] program that [the Navy] would have full and unimpeded access to all of the B–2 technology.

. . . .

. . . since the airplane was to be a miniature B–2, which would face all of the same unstable flight control issues, all of the same wind tunnel expenses, all of the same issues of dealing with engine inlets and outlets, it was just a smaller version of the B–2, that an enormous amount of money could be saved in wind tunnel time and development process by simply using the Air Force Northrop data.

Lehman Dep., at 104–05 (July 26, 1995).

7. Earlier in this litigation, the Government argued that it had no duty to provide such information because the contract did not require it to share classified superior knowledge. We ruled that plaintiffs alleged an actionable claim. *McDonnell Douglas Corp. v. United States*, 27 Fed.Cl. 204, 206 (1992) (ruling that defendant has a duty under *J.A. Jones Construction Co. v. United States*, 390 F.2d 886 (1968) to provide plaintiffs at least a "general warning" about problems concerning production of the aircraft).

ment of the B–2 and F–117A were preferable to others, according to plaintiffs. Lacking this background, plaintiffs complain that A–12 performance specifications were impossible to accomplish within the time and cost projections contemplated by the parties.

Defendant argues that plaintiffs' claim is groundless because their participation in other highly classified Air Force programs informed them about methods necessary to develop the A–12 according to specifications. The Government argues that if we would permit such evidence, defendant could demonstrate that plaintiffs possessed information and experience that negate a credible superior knowledge claim.

We terminated discovery in August 1993 because the Executive warned us that discovery could not be conducted safely. *See McDonnell Douglas Corp. v. United States,* No. 91–1204 (Fed.Cl. Aug. 11, 1993). Limited discovery resumed in April 1994 after plaintiffs persuaded us that accessible information could be segregated from non-accessible information. In April 1995 the court became aware that new problems would arise. We no longer believed that plaintiffs could segregate information safely, and closed discovery.

### A. Security Procedures

Portions of the B–2 and F–117A are in Special Access programs. Generally, there are three levels of classification: Top Secret, Secret, and Confidential. Agency heads are authorized to label programs Special Access when safeguards applicable to Top Secret and Secret are not sufficient to protect them. Access to such programs can be achieved only through special procedures. Admission is governed strictly by a controlling agency and granted sparingly on a "need-to-know" basis.[8] Only those essential to the program who meet all stipulated security requirements may view Special Access program information.

We established strict security measures to protect classified information in this case. Professional security officers who are trained

to safeguard sensitive information have helped the court manage discovery. We have been assisted by agency personnel who control access to classified and Special Access programs. Officials from the Department of Defense advised the court about the nature and the importance of information at stake through classified and unclassified declarations and briefings. We fashioned protective orders to accommodate these concerns while preserving the adversary process to the extent possible. Still, problems have occurred.

### B. Security Problems

1.

During an informal conference that we conducted periodically to facilitate discovery, counsel for General Dynamics informed the court that a request for access to certain information had been pending with the Government for an inordinate period of time. We asked government counsel to look into the matter and have the appropriate person make a decision. Counsel for General Dynamics also informed the court that his request for access was in the custody of the Navy's Litigation Team. This was troubling because we had ordered that security matters and litigation matters be kept strictly separate.

We determined that General Dynamics had made the request so that an employee of the company could communicate certain information to its counsel. Government counsel was unwilling or unable to tell the court why access for the attorney had been denied, and we instructed the Government to provide someone who could explain. The Government arranged a meeting for the court with Air Force Colonel John B. Hennessey, who described the nature of the request and his reason for declining it to plaintiffs' counsel. He assured the court that the Government's litigation team knew nothing about the information either. This was true so far as the Air Force knew, but it turned out that the information had been given to government lawyers by the Navy.[9] We ruled that the

---

8. Oddly, this important term is defined differently by various controlling agencies.

9. A number of government attorneys and management personnel gained access to this Air Force information improperly through the Navy.

Government could not give its own lawyers access to information for litigation purposes that at the same time it was prohibiting General Dynamics from giving to its lawyers.

In March 1993, Acting Secretary of the Air Force Michael B. Donley invoked the military and state secrets privilege to protect the information at issue.[10] Court security officers briefed the court *in camera* about this information and other information outside A-12 parameters that warranted our attention. We reviewed the information over which the privilege was asserted very carefully in an effort to isolate non-sensitive information. This review led to recommendations concerning means of advising plaintiffs' counsel of certain general concepts. Our concern was that plaintiffs' counsel might ask questions or make arguments that would compromise this information through inadvertence. Security officials were not willing to brief the concepts.

Later, we encouraged the Government to broaden its invocation of the military and state secrets privilege to include additional sensitive information that we expected to encounter. The Air Force expressed its concern for harm to national security if discovery were to proceed on these matters, but it chose not to formally invoke the military and state secrets privilege to protect them.

2.

Plaintiffs' counsel deposed Richard L. Rumpf, a former Navy official who had served as Deputy Assistant Secretary of the Navy, and Acting Assistant Secretary of the Navy. Mr. Rumpf was familiar with A-12 program classification guidelines as well as programs classified outside the A-12 program. He had been instructed to confine his answers to A-12 program information only. As noted earlier, Government counsel defending the deposition had gained access to pertinent information that had been denied plaintiffs' counsel.

Plaintiffs' counsel, not having been briefed prior to the deposition, asked questions to which Mr. Rumpf responded concerning matters outside the A-12 program. Mr. Rumpf conferred with security personnel and answered plaintiffs' questions in the belief that he was authorized to make such disclosures. He was not. Government counsel exacerbated the problem by asking Mr. Rumpf highly inappropriate, leading follow-up questions designed to elicit responses that would benefit defendant's legal position. This resulted in still more disclosures about information classified outside the A-12 program. No one acted to correct the mistake then, and complete transcripts of the deposition were distributed.

During a March 1993 courtroom hearing, plaintiffs' counsel read excerpts from the tainted deposition into the record. No immediate corrective action was taken. Hearing transcripts were distributed to the parties and used as an unclassified document. Plaintiffs' attorneys and personnel referenced portions of Mr. Rumpf's deposition in their notes and other internal memoranda. Plaintiffs quoted from and cited to the Rumpf deposition in pleadings issued to this court and to the Federal Circuit.

The Government did not identify a breach until mid-April 1993. It took steps to remedy the damage, but a series of miscalculations compounded the problem. The result was that plaintiffs' attorneys were exposed to

---

The Navy did not have authority to brief the Government's litigation team about the Air Force information. Plaintiffs' attorneys were not permitted to communicate with their client about information that defendant's attorneys not only had discussed with theirs, but also used in developing their defense to superior knowledge claims. This knowledge contributed to a serious security breach later.

10. We asked the Government to explain why its litigation team was given information so sensitive that the Air Force Secretary declared its disclosure for purposes of this litigation to be a threat to national security. The Government represent-

ed to the court that its lawyers needed access to the information so that they could defend the military and state secrets privilege. In fact, government lawyers obtained access to Air Force secrets long before the matter came to the attention of the Secretary of the Air Force. *See McDonnell Douglas Corp. v. United States*, No. 91–1204 (Fed.Cl. Dec. 23, 1993). We issued sanctions against the United States for this and related misrepresentations, and later removed them at the request of the Assistant Attorney General who stated that he would take corrective action.

information that they were not cleared to know.

### 3.

Plaintiffs deposed Admiral David Jeremiah, Vice Chairman of the Joint Chiefs of Staff, in July 1993. Admiral Jeremiah was familiar with information to which plaintiffs' attorneys had been denied access. Plaintiffs' counsel, still not briefed about concepts that should have been avoided, prompted Admiral Jeremiah into a discussion about information not authorized for disclosure. Defendant's attorney did not intervene. Admiral Jeremiah's comments were transcribed, and several days later security officials were forced to seize transcripts that had been distributed.

## III.  Justiciability

### A.  Military and State Secrets Privilege

■ The military and state secrets privilege grants the Executive the exclusive right to bar discovery of certain military secrets. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). That is, discovery into specific, classified areas may be terminated by the declaration of an appropriate official. *Id.* at 7–8, 73 S.Ct. at 531–32; *Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C.Cir. 1983) ("When properly invoked, the state secrets privilege is absolute.").

■ Invocation of the military and state secrets privilege is proper if the court finds that the appropriate person signed it (head or acting head of the agency that controls the secret), the person did so after careful consideration, and the person used the proper words to invoke the privilege. *Reynolds*, 345 U.S. at 7–8, 73 S.Ct. at 531–32. Once satisfied of these formalities, the court may review and evaluate the subject material *in camera*. "The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect." *Id.* at 8, 73 S.Ct. at 532 (footnotes omitted). If the proper official has declared that the risk of disclosing the privileged information is a significant threat to the nation's security, the information must be removed from the case.

### 1.  *Reynolds*

*United States v. Reynolds* is the source of much state secrets privilege jurisprudence. In that case, three civilian observers aboard an Air Force B–29 were killed when an engine exploded, causing the aircraft to crash. At the time of the accident the Air Force was testing secret electronic equipment aboard the aircraft. Widows of the deceased brought their consolidated actions against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2674. In pre-trial discovery, plaintiffs moved to obtain the Air Force's official accident investigation report and narratives from three surviving crew members.

The Government responded first by moving to quash this request on the grounds that the report and narratives were privileged matters according to Air Force regulations. The trial court disagreed. This prompted the Secretary of the Air Force to write the trial court and explain that the report could not be disclosed because "the aircraft in question, together with the personnel on board, were engaged in a highly secret mission of the Air Force." *Reynolds*, 345 U.S. at 4, 73 S.Ct. at 530.

The court requested *in camera* review of the report to evaluate the validity of the Government's position, but the Government refused. The court assessed Rule 37 sanctions, held a hearing on damages, and entered final judgment for plaintiffs. The case was affirmed on appeal, but the Supreme Court reversed and remanded for further proceedings. It also set forth the protocol for trial courts to observe when confronted with the state secrets privilege.

Thus, *Reynolds* directs trial courts to oversee proper invocation of the state secrets privilege and to remove evidence from the case when warranted. *Reynolds'* progeny struggle to define the result of that action. With evidence removed from the case, should the court proceed? If not, who wins? What must the plaintiff show to keep its claim alive? Conversely, how may the Government defend itself?

### 2. *Farnsworth*

A contractor sued a Navy employee for wrongful interference with prospective contractual relations in *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir. 1980) (en banc) (per curiam). Inquiries about Grimes' responsibilities within the Navy led the Secretary of the Navy to invoke the state secrets privilege. The invocation was proper, and Grimes moved to dismiss the case against him. The trial court granted his motion on the basis that the plaintiff was manifestly unable to prove its case without the state secret. The Fourth Circuit affirmed the trial court's decision *en banc*, citing its concern about the danger of interrogating witnesses in open court about sensitive matters. "In an attempt to make out a prima facie case during an actual trial, the plaintiff and its lawyers would have every incentive to probe as close to the core secrets as the trial judge would permit. Such probing in open court would inevitably be revealing." *Id.*

Had there been enough nonprivileged information available for the plaintiff to make a *prima facie* case without jeopardizing privileged information, perhaps the case could have advanced. *Accord Halkin v. Helms*, 690 F.2d 977, 998–99 (D.C.Cir.1982) (*Halkin II*) (without access to privileged information, plaintiffs could not state claim or prove injury in fact to trigger standing).[11]

### 3. *Ellsberg*

In *Ellsberg v. Mitchell*, 709 F.2d 51 (D.C.Cir.1983), former defendants in a criminal action brought suit against government officials responsible for conducting warrantless surveillance activities. They sought specific responses about wiretaps from the Government. This prompted several high-ranking government officials, including the Attorney General, the Director of Central Intelligence, and the Secretary of Defense, to invoke the state secrets privilege to protect against disclosure of information related to numerous "overhears" of plaintiffs' private conversations. The district court reviewed affidavits *in camera* and concluded that disclosure would cause adverse consequences for national security. Defendant then filed a motion to dismiss, and the court entered partial judgment for the Government. On appeal, the district court's decision was reversed and remanded for additional proceedings. Here, the Circuit court thought that enough nonprivileged information was available for some of the plaintiffs to assemble a *prima facie* case.

### 4. *Zuckerbraun*

Defense contractors in *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544 (2nd Cir.1991) were sued for negligent design, manufacture, testing, and marketing of the anti-missile defense system aboard the U.S.S. Stark, a Navy frigate stationed in the Persian Gulf. In 1987, a missile launched from an Iraqi jet fighter escaped the Stark's defenses and killed 37 crewmen. The executor for one member of the crew brought suit. Representatives of 23 other deceased crewmen filed their own actions in a separate suit, which was appealed to the Fifth Circuit in *Bareford v. General Dynamics Corp.*, 973 F.2d 1138 (5th Cir.1992).

The allegations in *Bareford* substantially paralleled those asserted in *Zuckerbraun*. In both cases, defendants moved to dismiss because the subject matter was barred by the military and state secrets privilege. Secretary of the Navy H. Lawrence Garrett, III invoked the privilege properly, and demonstrated the grave risks that would accompany disclosure of the protected information. Both courts ruled that dismissal was proper. In *Bareford*, the plaintiffs provided over 2,500 pages of information to support their case, but the court curtailed proceedings because the plaintiffs alleged defects for which proof—if it existed—was barred by the privilege. Liability depended on whether the defendants were negligent, and "[t]hese questions cannot be resolved or even put in dispute without access to data regarding the design, manufacture, performance, functional characteristics, and testing of these systems

---

**11.** At least one court has interpreted *Farnsworth* to mean that when a plaintiff possesses privileged information, and therefore has an incentive to draw as close as possible to the bounds of disclosure to prove its case, dismissal should automatically follow an invocation of the privilege. *Ellsberg v. Mitchell*, 709 F.2d 51, 65 (D.C.Cir.1983) (dicta).

and the rules of engagement under which the Stark was operating." *Zuckerbraun,* 935 F.2d at 547.

### 5. *Molerio*

Invocation of the state secrets privilege may produce harsh results. The plaintiff may be unable to prove its case; the Government may be unable to defend itself. The latter consequence has led to the dismissal of a case in which a jury would have been led to false conclusions without the secret information. *Molerio v. FBI,* 749 F.2d 815, 825 (D.C.Cir.1984).

In *Molerio v. Federal Bureau of Investigation,* plaintiff sued the FBI for illegally and unconstitutionally refusing to hire him as a special agent. One of the charges alleged that the FBI's decision was unconstitutional because it was "based at least in part on the political activities and beliefs of his father." *Id.* at 824. The state secrets privilege was properly invoked and included an affidavit describing the FBI's reason for denying employment to plaintiff. The reason was sensitive, and its disclosure would have impaired national security. After *in camera* review, the court determined that the reason Molerio was not hired "had nothing to do with [his father]'s assertion of First Amendment rights." *Id.* at 825. Having the benefit of information provided *in camera,* and cognizant of the fact that perhaps enough circumstantial evidence existed on the surface for the plaintiff to lead a jury into factual error, the court terminated proceedings.

Presenting such a case to the jury, even on the basis of nonprivileged information, would have "involve[d] an attempt, however well intentioned, to convince the jury of a falsehood." *Id.* The court declined to entertain a sham proceeding. "Although there may be enough circumstantial evidence to permit a jury to come to [an] erroneous conclusion, it would be a mockery of justice for the court—knowing the erroneousness—to participate in that exercise." *Id.* The D.C. Circuit subsequently interpreted *Molerio* to mean that when privileged material would establish a genuine defense, summary judgment against

the plaintiff is proper. *In re United States,* 872 F.2d 472, 476 (D.C.Cir.1989) (dicta).

### B. Unfair Prejudice

Ten representatives from plaintiffs' litigation team have access to B–2 and F–117A program information. The Government's litigation team enjoys similar access. But the B–2 and F–117A are only two programs employing low-observable technology. If other programs are relevant, they will not be used in this case, and one party or the other would be unfairly prejudiced as a result.

Plaintiffs have maintained that they could prove superior knowledge within the confines of the programs to which they have been given access. That may be true. We do not doubt plaintiffs' ability to present a persuasive case based on this information alone. But defendant may be unfairly prejudiced if discovery were restricted to these programs. Secretary Donley's declaration is illustrative. The evidence that he protected by invoking the military and state secrets privilege was classified beyond A–12 program information.

Defendant has contended that it could demonstrate plaintiffs' expertise in the techniques, design, and composite characteristics necessary to develop the A–12 according to specifications. Just as we acknowledge plaintiffs' belief that they could prove superior knowledge within the confines of the A–12 program, we know that the Government may have defenses based on the factors described in *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774 (1963).[12] Plaintiffs are involved in other programs with the Government; it is possible that they did not lack knowledge about low-observable technology.

■ Plaintiffs state that whether the Government may defend itself by asserting evidence from other Stealth programs should not concern the court. It does concern us, however, for the same reason that we did not dismiss plaintiffs' claim when Secretary Donley invoked the privilege. We gave plaintiffs an opportunity to make a *prima facie* showing that they could make a case without the

---

**12.** *Helene Curtis* requires a plaintiff to establish the following elements: (1) defendant possessed the information; (2) plaintiff neither knew nor

had reason to know the information; (3) defendant did not supply the information; and (4) plaintiff was therefore misled.

privileged information. A claim should be dismissed if a *prima facie* showing cannot be accomplished safely, or if it would lead to a false result. *See Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 281 (4th Cir.1980) (en banc) (per curiam); *Molerio v. FBI,* 749 F.2d 815 (D.C.Cir.1984). To avoid unfair prejudice to defendant, we apply the same principle.

> If the information is essential to establishing plaintiff's prima facie case, dismissal is appropriate.... If, on the other hand, the information related not to plaintiff's claim, but rather to the defense, summary judgment against the plaintiff is proper if the district court decides that the privileged information, if available to the defendant, would establish a valid defense to the claim.

*In re United States,* 872 F.2d at 476 (citing *Molerio,* 749 F.2d at 825). If we were to try the claim on the basis of plaintiffs' *prima facie* evidence, defendant may be unable to defend itself. Plaintiffs argue that we may try this case on a limited basis. We have searched for ways to do this, but the result could be unfair to one or both parties. A trial would not be conclusive.

At trial, plaintiffs would establish their superior knowledge claim. Defendant would seek to reply by presenting evidence of plaintiffs' exposure to relevant information through involvement with non–A–12 programs. If permitted to present this information, defendant possibly would not be prejudiced. But might other information redeem plaintiffs' allegations in rebuttal? Plaintiffs would not know. This scenario would recur in different forms in the course of discovery or trial. The Executive necessarily would block the parties' probing at some point, and such an invocation of the military and state secrets privilege would cease discovery or testimony. The timing of the privilege would determine who among the litigants would be damaged. The Executive's job is to protect its secrets; it has no obligation to find the truth.

#### C. High Risk Information

Unique materials and components whose efficacy has been proven in the B–2 and F–117A programs enable those aircraft to ex- ploit low-observability characteristics. The B–2 and F–117A programs now are acknowledged programs. The public knows that these programs exist, though the materials and component information critical to the effectiveness of low-observable features remains closely guarded. We may not defend easily against an enemy that would acquire such information, so significant risks would accompany discovery of matters related to these components and materials. But such discovery could be conducted with manageable risk. The United States is proficient at protecting technical jargon that explains tangible features of a known product. The Air Force and the Navy have means to suppress or eliminate this risk.

This case involves more than technical, "blueprint" information about the B–2 and F–117A, however. Discovery in this litigation has swept us against less concise yet potentially more vulnerable compartments of knowledge. Inadvertent disclosure of their existence may be tantamount to full disclosure.

When Acting Secretary Donley invoked the military and state secrets privilege, he made the following observation:

> The mere existence of an unacknowledged program is classified within the boundaries of the special access program. That is, one must be approved for access before one may know that the program exists at all.

*Donley Decl. at 4.* If discovery were allowed to proceed and the Air Force invoked the military and state secrets privilege only as to certain matters, an attentive observer could establish an informed impression of this privileged information.

> [I]f a witness is questioned about facts A and B, the witness testifies that fact A is not a military secret, and the government objects to any answer regarding fact B, by implication one might assume that fact B is a military secret.

*Bareford v. General Dynamics Corp.,* 973 F.2d at 1143 (citing *Fitzgerald v. Penthouse*

*International Ltd.*, 776 F.2d 1236, 1243 n. 10 (4th Cir.1985)).[13]

The classified information in *Reynolds* related to experimental electronics equipment aboard an Air Force B–29. The plaintiffs sought an explanation for the plane's failure and requested that defendant produce the Air Force's post-accident report. At stake was the disclosure of hard data about this equipment that the Air Force did not want made public. Had a copy of this hard data circulated among technicians, it would have proved to be harmful to national security. Still, the danger of inadvertent disclosure of such "blueprint" material is less than that of "concept" information that is far easier for most people to understand and remember. Concept information is difficult to recoup, as well. "Blueprints" can be tracked and revoked, ideas or concepts cannot.

Evidence sought by the plaintiffs in *Zuckerbraun* and *Bareford* dealt directly with matters most sensitive to the Navy's missile defense systems. The military and state secrets privilege was invoked, and the courts considered whether they could proceed based on non-privileged information alone. The plaintiffs offered substantial *prima facie* evidence, but their claim depended too heavily on protected information. To proceed without the privileged information would have been pointless because a prerequisite to establishing negligent manufacture, design, and testing of the missile defense system was to obtain the very information the Navy could not impart for security reasons.

Likewise, plaintiffs' superior knowledge claim requires that the parties have access to information that the Air Force cannot impart for security reasons. We have established that it is not proper to consider plaintiffs' *prima facie* evidence in a vacuum when defendant might refute plaintiffs' evidence with greater access. By its nature, plaintiffs' superior knowledge claim is burdened with information that can never be in evidence.

We are absorbed by the concerns expressed in *Farnsworth* about the temptation for parties to probe as close to privileged information as possible in open court. That court decided that dismissal was appropriate because sensitive matters could not be cordoned off in a safe manner, even under the supervision of a trial judge. The information at stake in the present case is vulnerable to inadvertent disclosure. Notwithstanding plaintiffs' ability to present a *prima facie* case based on A–12 program information alone, the Government's incentive would be to expand the inquiry into other areas to defend itself.

### D. Constructive Invocation of the Privilege

The privilege "is not to be lightly invoked. There must be a formal claim of privilege. . . ." *Reynolds*, 345 U.S. at 7–8, 73 S.Ct. at 532. We do not have a broad formal invocation of the military and state secrets privilege to rely upon in the present case. In July 1993, General Merrill A. McPeak warned the court that matters of national security could be implicated in this litigation, but did not formally invoke the state secrets privilege:

I have reviewed the determinations of Acting Secretary Donley regarding his invocation of the military and state secrets privilege, and I concur completely in his assessments and judgments on those matters.

I have concluded that continued inquiry into what is known as plaintiffs' "superior knowledge" claims would necessarily require examination and use of information that *cannot be disclosed in this litigation.* Litigation of plaintiffs' "superior knowledge" claims would present a continuing threat of disclosure of information for which the military and state secrets privilege has been asserted, *and would present a need for disclosure of additional information over which I would assert the privilege.*

---

**13.** The *Bareford* court explained that

in some cases it is appropriate that the courts restrict the parties' access not only to evidence which itself risks the disclosure of a state secret, but also those pieces of evidence or areas

of questioning which press so closely upon highly sensitive material that they create a high· risk of inadvertent or indirect disclosures.

*Bareford*, 973 F.2d at 1144.

McPeak Decl. at 2–3 (July 22, 1993) (emphasis supplied). We view this as a decisive statement from the Acting Secretary of the Air Force that further discovery into such matters would compromise national security. It is difficult to conceive of a more thorough and persuasive declaration of the Executive's position than that submitted by General McPeak. And he was not alone in his assessment of the situation. Secretary Donley's declaration explored the potential for unauthorized disclosure to harm national security:

> The United States is the world leader in the production and operation of low observable technology weapons and aircraft. Low observable weapons systems and aircraft have been used in combat, without the loss of United States' life or aircraft. We believe that no foreign country presently has either the capability to build low observable aircraft or the capability to develop a credible countermeasure to this technology. The United States has a very limited capability to counter this technology, should it be developed and used against us by a foreign country. Accordingly, inadvertent, unauthorized disclosure of the information that is described in more detail in my *in camera* declaration could severely jeopardize national security.

Donley Decl. at 5–6 (March 30, 1993). Likewise, Secretary Rice expressed reservations about probing Stealth technology:

> The unauthorized disclosure of the national security information at issue reasonably could be expected to cause *extremely grave damage to the national security* . . . . If the stealth technology from classified, special access programs, such as the B–2 or F–117A is disclosed without authorization, this will weaken our country's ability to defend itself and could place at risk our aircraft and the lives of the crews of those aircraft.

Rice Decl. at 4–5 (Nov. 20, 1992) (emphasis supplied).

Invocation of the state secrets privilege can have devastating effects on parties to litigation. For that reason, *Reynolds* erected procedures that protect against improper use of the privilege. A court should not be left to ponder the Executive's intentions; General McPeak has made the Executive's intentions clear.

The absence of a formal claim of privilege ("I hereby invoke the military and state secrets privilege") does not persuade us to reopen superior knowledge discovery to address plaintiffs' equitable adjustment claims. The addition of such words to General McPeak's declaration would not enhance its import. General McPeak issued his declaration as the Acting Secretary of the Air Force. He personally reviewed the materials that caused him concern, and he stated that continued pursuit into plaintiffs' superior knowledge claim was unacceptable. The absence of a formal claim of privilege cannot mean that we should have encouraged the parties to proceed with superior knowledge discovery. General McPeak must have intended his strong words filed with the court to have an effect, however, and to cause some action by the court.

Unauthorized disclosures and questionable use of classification procedures by the Government have added to a general unease about litigating plaintiffs' equitable adjustment claims further. General McPeak's declaration was issued in the wake of the Jeremiah episode. His statement was urgent and clear: further pursuit of plaintiffs' claim would result either in removal of critical information from the case, or unauthorized disclosure. Neither option allows us to proceed.

We have no reason to hesitate in the face of the Executive's request as the trial court did in *Reynolds*. The record before the trial court in *Reynolds* was not clear enough for it to determine that the plaintiffs were demanding privileged information.

> On the record before the trial court it appeared that this accident occurred to a military plane which had gone aloft to test secret electronic equipment. Certainly there was a reasonable danger that the accident investigation report would contain references to the secret electronic equipment which was the primary concern of the mission.
>
> Of course, even with this information before him, the trial judge was in no position to decide that the report was privi-

leged until there had been a formal claim of privilege. Thus it was entirely proper to rule initially that petitioner had shown probable cause for discovery of the documents.

*Reynolds*, 345 U.S. at 10, 73 S.Ct. at 533. Thus, the Supreme Court concluded that the trial court was justified in requiring production of the accident report until the privilege was invoked. An engine explosion caused the plane to crash. It may have appeared to the trial court that the electronic equipment on board had little to do with a mechanical engine failure. It was important for the Executive to invoke the privilege formally in *Reynolds*. That is not true of this case.

We are not dealing with a "reasonable danger" that attempts to prove plaintiffs' claims could jeopardize privileged information; such events already have occurred. Plaintiffs' superior knowledge claim requires that attorneys and the court view and use detailed information about highly sensitive defense programs. "Superior knowledge" demands information concerning who knew what and how they knew it.

*Molerio* is very different from this case in that a single discrete fact was at issue there. It was not technical information, but an easily understood fact that the court knew to be entirely dispositive of the case. Yet the principles enunciated in *Molerio* inform the action that we take today.

The court in *Molerio* dismissed the case because it was made obvious to the court that plaintiff's constitutional claim was meritless. The public record consisted of facts that appeared to support the plaintiff's argument, but in fact they did not. The privileged information convinced the court that plaintiff's version of the facts was not consistent with reality, so the court refused to allow the case to proceed to trial.

The principle motivating *Molerio* is the court's refusal conduct a sham trial. The court knew the plaintiff's argument had no merit. It would have been an affront to our system of justice to allow the jury to determine facts that bore no relation to reality. The state secrets privilege was formally invoked in *Molerio,* but the court's decision to dismiss the plaintiff's claim did not depend on whether the Executive complied with *Reynolds* procedures. *Molerio* directs the court to dismiss claims that are predicated on a misperception even if the truth is unknown to the plaintiff. It is immaterial how a court becomes aware of the truth. So long as a claimant has assumed a flawed set of facts, the court should dispose of that claim.[14]

We should not delve further into programs that surround this case to obtain information that may benefit one party or the other.

> It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.

*Reynolds,* 345 U.S. at 10, 73 S.Ct. at 533. We cannot know fully the effects that privileged information omitted from evidence would have for the parties in this case. We do know that other low-observable information exists. *Molerio* -type facts may inhabit some of this information, but it would never be a part of this case.

Conducting a trial without a critical dispositive fact would result in a sham. Conducting a trial without numerous layers of poten-

---

14. Earlier in this litigation, we were faced with a true *Molerio* -type problem. Plaintiffs presented a reasonable claim based on the available facts and circumstances. Defendant objected that the facts available to plaintiffs were misleading and that the truth was contained in classified, non-accessible documents. We reviewed the classified materials *in camera* and verified defendant's argument. The facts upon which plaintiffs prem- ised their claim upon did not reflect reality. If defendant could have explained without endangering national security, it could have presented a complete defense to the claim. We were satisfied that the classified information could not be disclosed under any circumstances. We dismissed the claim without a claim of privilege, and plaintiffs accepted the ruling.

tially dispositive facts has the same result. The situation that we confront is the latter.

We cannot rule on the basis of an incomplete record. The *Molerio* court knew that the plaintiff's claim was insupportable. The record did not reflect this reality, however, and the court was forced to intervene. Here, the relevant facts cannot be obtained in a form that we can use to support a judgment. In a case of this unique nature, we need not know specifics about what information is or will be subject to removal by the Executive; we are satisfied that trying this case would lead to an incomplete record on which rulings by the trial court and consideration by the Federal Circuit on appeal, would be a sham.

### CONCLUSION

Every member of this Court is accustomed to hearing complex litigation involving millions of dollars and hundreds of millions of dollars. Such cases are common here and many involve sensitive national secrets. But unique circumstances prevent further trial on the merits of this case. Those circumstances prevent us from ruling on plaintiffs' claim to profits and defendant's claim to a loss adjustment. Information critical to both parties cannot be litigated for reasons stated here, and in the classified appendix.

Limiting plaintiffs' damages to incurred costs and removing defendant's loss ratio from the case spreads the consequences of a difficult and dangerous problem. The Government's defense relies heavily on classified information that would be extremely vulnerable if introduced. The nature of some information makes even peripheral references to it hazardous. Despite everyone's best efforts, the risk of compromising national secrets is too serious to proceed to trial.

The parties have stipulated damages based on our rulings to date. The Clerk will enter judgment in the amount of plaintiffs' incurred costs plus interest upon notice from the court.

IT IS SO ORDERED.