**McDONNELL DOUGLAS CORPORATION, Plaintiff–Cross Appellant,**

**and**

**General Dynamics Corporation, Plaintiff–Cross Appellant,**

**v.**

**UNITED STATES, Defendant–Appellant.**

**Nos. 98–5096, 98–5122, 98–5123.**

United States Court of Appeals, Federal Circuit.

July 1, 1999.

Bruce J. Ennis, Jr., Jenner & Block, Washington, DC, argued for plaintiffs-cross-appellants. With him on the brief were David W. DeBruin and Deanne E. Maynard. Also on the brief were Caryl A. Potter, III and Elizabeth A. Ferrell, Sonnenschein Nath & Rosenthal, Washington, DC. Of counsel on the brief were John W. Walbran, McDonnell Douglas Corporation, Berkeley, Missouri; Herbert L. Fenster and David A. Churchill, McKenna & Cuneo, L.L.P., Washington, DC; and Edward C. Bruntrager, General Dynamics Corporation, Falls Church, Virginia.

Mark B. Stern, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Stephen W. Preston, Deputy Assistant Attorney General; David M. Cohen, Director, and Bryant G. Snee, Assistant Director, Commercial Litigation Branch; and Jacob M. Lewis, Thomas M. Bondy, Michael S. Raab, and H. Thomas Bryon, III, Attorneys, Appellate Staff. Of counsel on the brief was George P. Williams, Special Counsel for Litigation, Office of General Counsel, Department of the Navy, Arlington, Virginia.

Before MAYER, Chief Judge, MICHEL and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

This dispute arises out of the government's default termination of a contract between the United States Navy and defense contractors McDonnell Douglas Corporation and General Dynamics Corporation ("Contractors") to develop a carrier-based, low-observable "stealth" aircraft known as the A–12 Avenger. After several years of litigation, the United States Court of Federal Claims held that the government's termination of the contract for default could not be sustained because the government did not exercise the requisite discretion before entering a default termination, *see McDonnell Douglas Corp. v. United States*, 35 Fed. Cl. 358, 368–71 (1996) (hereinafter *McDonnell Douglas IV*), and converted the termination for default into a termination for convenience, awarding Contractors costs totaling $3,877,767,376. *See McDonnell Douglas Corp. v. United States*, 40 Fed. Cl. 529, 555–56 (1998) (hereinafter *McDonnell Douglas IX*). We hold that, because the termination for default was predicated on contract-related issues, it was within the discretion of the government. Accordingly, the Court of Federal Claims' conversion of the termination for default into a termination for convenience was in error. We reverse the trial court's judgment and remand the case to the trial court for a determination of whether the government's default termination was justified, an issue upon which we express or intimate no view.

I

A

In 1984, the Department of the Navy introduced the Advanced Tactical Aircraft

Program, known as the A–12 program, to develop a carrier-based stealth aircraft for the Navy. In January 1988, Contractors entered into a Full Scale Engineering Development contract (the "A–12 FSD Contract") with the government to produce eight FSD aircraft at a target price of $4,379,219,436. *See McDonnell Douglas IV*, 35 Fed. Cl. at 361. The contract was structured as an incrementally funded, fixed-price incentive contract with a ceiling price of · $4,777,330,294, and recited a schedule of installment payments over the five-year term of the contract. The first aircraft was originally scheduled to be delivered in June 1990, and subsequent aircraft were to be delivered each month through January 1991. *See id.* at 361–62.

From the outset, Contractors encountered difficulties in performing the contract. Particular problems included meeting the contract schedule and keeping the aircraft weight within specifications. At the beginning of 1990, the Department of Defense initiated a Major Aircraft Review to evaluate various major aircraft programs in view of recent changes around the world and the corresponding reduced threat to national security. *See id.* at 362. The A–12 program was included in this Review, and Defense Secretary Richard Cheney visited the McDonnell Douglas plant as part of the review process. By the early part of 1990, the Navy's contracting officer knew that Contractors would not meet the delivery date for the first aircraft. *See id.* However, although Secretary Cheney was apprised of some concerns in the A–12 program, the review concluded that there was a continuing need for the A–12 and that the Navy should pursue the program. *See id.* at 363. Secretary Cheney reported these results during his testimony before Congress in April 1990.

In June 1990, Contractors informed the Navy that they could not meet the contract schedule, that the cost of completing the contract would substantially exceed the ceiling price, and that Contractors could not absorb the loss that would result from the contract. Contractors asserted that a fundamental problem with the FSD contract was its structure as a fixed-price contract and proposed that the contract be modified. Thereafter, Contractors submitted a proposal to change the contract schedule, but the Navy and Contractors failed to reach an agreement on that issue. Instead, on August 17, 1990, the Navy unilaterally issued a contract modification that changed the delivery schedule for the aircraft. Under this modification, the delivery date of the first aircraft was delayed until December 1991, and the remaining aircraft became due periodically between February 1992 and February 1993. *See* Contract Modification P00046 ¶ 1(b), Joint Appendix at 15,657.

In November 1990, Contractors submitted a formal request to the Navy to restructure the contract as a cost-reimbursement type contract. At the end of the same month, two reports were published which documented the handling of the A–12 program under the Major Aircraft Review. The Navy's "Beach Report," dated November 28, 1990, found that the A–12 program manager had been unreasonable both in reaching a conclusion that the contract could be performed within the ceiling price and in evaluating the risk of failing to meet the contract schedule. *See ·McDonnell Douglas IV*, 35 Fed. Cl. at 363. The Beach Report criticized several Navy officials involved in the A–12 program. Separately, a November 29, 1990 Department of Defense Inspector General report concluded that problems in the A–12 program were inaccurately identified during the Review because the Review did not accord with specified procedures and was otherwise handled poorly. *See id.*

During the Secretary's briefing to the President of the United States in early December 1990, the Secretary indicated his disappointment with the Navy's handling of the A–12 program and promised to take appropriate actions. On December 3, the Secretary directed the Deputy Secretary of Defense to review and report on the status of the A–12 program within ten

days. This resulted in several meetings by the Defense Acquisition Board and Defense Procurement Review Boards. In addition, on December 12, the Secretary of the Navy responded to Secretary Cheney's December 3 request with a memorandum that expressed concern about Contractors' ability and willingness to perform under the contract, and which noted in particular Contractors' belief that the government should assume responsibility for failure to meet goals under the contract, and that the government should restructure the contract. The memorandum concluded with a statement that the Navy would examine whether the contract should be terminated for default, and would make a recommendation to the Secretary by January 5, 1991. *See id.*

On Friday, December 14, Secretary Cheney directed the Secretary of Navy to show cause by January 4, 1991 why the A–12 program should not be terminated. The following Monday, December 17, the Navy issued a cure notice to Contractors stating that unless they were able to meet contract specifications by January 2, 1991, the government might choose to terminate the contract for default. In particular, the cure letter stated that, *inter alia,* Contractors had "failed to fabricate parts sufficient to permit final assembly in time to meet the schedule for delivery," and had "fail[ed] to meet specification requirements." Joint Appendix at 16,524. The letter asserted that "[t]hese conditions are endangering performance of [the] contract." *Id.*

High-level meetings between the responsible government personnel, including the contracting officer and the general counsels of the Department of Defense and of the Navy, and Contractors, including the Chief Executive Officers of McDonnell Douglas and General Dynamics, occurred on December 18 and 21. During these meetings, Contractors asserted that they "[c]an't get there if we don't change contract," *id.* at 16,533, and "[i]t has got to get reformed to a cost type contract or we cannot do it." *Id.* at 16,549. When asked by the government on December 21 "can

you correct deficiencies to provide an aircraft that meets the requirements," Contractors replied "[a]ll deficiencies cannot be corrected. Can we deliver a satisfactory aircraft for the Navy? Mother nature won't allow correction of all defects. We'll do the best we can and the Navy has to decide if that's good enough." *Id.* at 16,548–49.

Contractors responded to the cure notice on January 2 by admitting that they "[would] not meet delivery schedules or certain specifications of the original contract, or the revised FSD delivery schedule." *Id.* at 18,175. Contractors did not contest that they had failed to fabricate parts in time to meet the delivery schedule for the FSD aircraft. Nonetheless, Contractors asserted that they were not in default because, in their view, the delivery schedules were invalid or unenforceable. *See id.* at 18,175–78. As suggested cure, Contractors submitted a proposal to restructure the contract, pursuant to which Contractors would absorb a $1.5 billion fixed loss on the cost overrun from the contract, the contract would be restructured to a cost reimbursement contract, and Contractors would waive their claims for equitable adjustment. Contractors proposed to restructure the contract pursuant to Pub.L. No. 85–804, which gives the President of the United States the power to authorize departments or agencies connected with national defense to grant extraordinary relief under contracts if such an action facilitates the national defense. *See* 50 U.S.C. § 1431 (1994).

On Saturday, January 5, Secretary Cheney met with Undersecretary of Defense for Acquisition Yockey, the Secretary of the Navy, and the Chairman of the Joint Chiefs of Staff to discuss the budget and the A–12 program. At the meeting, Secretary Cheney noted that a scheduled payment of $553 million—one of the largest installment payments under the A–12 contract—was due on Monday, January 7. Later that day, Secretary Cheney, acting under authority pursuant to Pub.L. No. 85–

804, decided not to grant relief. On Sunday, January 6, Undersecretary Yockey informed Rear Admiral William R. Morris, who at this time was acting as contracting officer over the A–12 contract, that Secretary Cheney had denied 85–804 relief and that no further funds would be obligated under the A–12 program. The next day, Admiral Morris issued the termination letter to Contractors stating that the government was terminating the A–12 contract due to Contractors' default.

### B

On February 5, 1991, the Navy sent a letter to Contractors demanding the return of approximately $1.35 billion in unliquidated progress payments under the terminated contract. On June 7, Contractors filed suit in the United States Court of Federal Claims under the Contract Disputes Act, 41 U.S.C. § 609(a) (1994), requesting that the court: (1) grant their equitable adjustment claims dated December 31, 1990, (2) convert the government's termination for default into a termination for convenience, (3) deny the government's demand for return of progress payments, (4) award Contractors costs and a reasonable profit under the contract, (5) award them settlement expenses, and (6) award damages for breach of contract. *See McDonnell Douglas Corp. v. United States*, 25 Cl.Ct. 342, 346 (1992).

After several years of litigation in the Court of Federal Claims, that court ruled, in a decision dated April 8, 1996, that the government's default termination was invalid according to *Schlesinger v. United States*, 182 Ct.Cl. 571, 390 F.2d 702 (Cl.Ct. 1968). *See McDonnell Douglas IV*, 35 Fed. Cl. at 368–71. The trial court held that under *Schlesinger*, the government is required to exercise "reasoned discretion" before terminating a contract for default, and that the government failed to meet this requirement because the Secretary of Defense's actions effectively forced the Navy to terminate the A–12 contract for default. *See id.* at 369–71. Therefore, the trial court vacated the government's termination for default and converted it into a

termination for convenience. *See id.* at 361.

In further litigation over damages, Contractors claimed that they were entitled to recover a reasonable profit under the contract, whereas the government argued that any recovery should be reduced by an appropriate loss-adjustment ratio. Contractors further alleged that the government possessed knowledge regarding how difficult it would be to perform the A–12 contract, and that under the "superior knowledge" doctrine, the government had a duty to either disclose such knowledge or otherwise protect Contractors against suffering unreasonable losses under the contract. The court held that the government's claim for a loss adjustment, Contractors' claim for reasonable profits, and the superior knowledge claim could not be further litigated because of the government's invocation of the "state secrets doctrine," *see McDonnell Douglas Corp. v. United States*, 37 Fed. Cl. 270, 272 (1996) (hereinafter *McDonnell Douglas V*), which grants the Executive the exclusive right to bar discovery into specific classified areas that affect state secrets. *See United States v. Reynolds*, 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The court ultimately denied the government's claim for return of $1.35 billion in unliquidated progress payments, and allowed Contractors total costs under the contract of approximately $3.88 billion. Taking into account progress payments of some $2.68 billion that had already been paid to Contractors, the court entered judgment of approximately $1.2 billion in favor of Contractors. *See McDonnell Douglas IX*, 40 Fed. Cl. at 555–56.

The government appeals from the trial court's decision to convert the default termination to a termination for convenience, and from the trial court's refusal to apply a loss-adjustment ratio in calculating damages. Contractors conditionally cross-appeal the trial court's ruling, arguing that the government has no power to terminate an incrementally-funded contract for fail-

ure to make progress toward a goal that has not yet been funded. Contractors also assert that their recovery cannot be reduced by a loss-adjustment factor based on the estimated cost of completing work that was never funded. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II

■ The level of discretion that must be exercised by the government before terminating a contract for default is a question of law, which we review *de novo. See Darwin Constr. Co. v. United States,* 811 F.2d 593, 596 (Fed.Cir.1987); *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1479 (Fed.Cir.1997). We will upset the trial court's factual findings, however, only if they are clearly erroneous. *See, e.g., Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed.Cir.1998).

## A

The trial court held that the government's termination of the A–12 contract did not comport with the rule laid down in *Schlesinger* by the United States Court of Claims, our predecessor court, for a proper default termination. *Schlesinger* involved a cap manufacturer who won a contract to supply the Navy with 50,000 service caps for enlisted men. The contract required the manufacturer to submit pre-production samples of component materials, as well as two samples of the completed cap, to the government for approval prior to production. In addition, the contract included a delivery schedule which set forth delivery dates for five separate installments of the completed caps. *See Schlesinger,* 390 F.2d at 703–04. Schlesinger did not submit the two sample caps and certain thread for pre-production approval, perhaps because he had fulfilled a contract for 240,000 identical Navy caps the previous year. Schlesinger also failed to deliver the first installment of caps as specified in the delivery schedule. *See id.* At the time, Schlesinger was also a prime suspect in an ongoing United States Senate subcommittee investigation regarding textile procure-

ment irregularities within the military. Indeed, Schlesinger testified before the subcommittee during the pendency of his supply contract; shortly after his testimony, the chairman of the subcommittee sent a letter to the Navy implying that Schlesinger's contract should be terminated. This information was communicated to the contracting officer, who promptly terminated Schlesinger's contract. *See id.* at 705–06.

The Court of Claims held that the default termination of Schlesinger's contract was illegal. In doing so, the court first found that Schlesinger was indeed technically in default under the terms of the contract. *See id.* at 706–07. However, the court determined that neither the contracting officer nor anyone else in the Navy exercised independent judgment in terminating the contract for default. *See id.* at 707–08 (citing *John A. Johnson Contracting Corp. v. United States,* 132 Ct.Cl. 645, 132 F.Supp. 698, 704–05 (1955)). Thus, the court found that the contractor's "bare" or "technical" default "served only as a useful pretext for the taking of action felt to be necessary on other grounds unrelated to the [contractor's] performance...." *Id.* at 709.

The illegality in *Schlesinger* stemmed from the Navy's reliance on contractor default as a pretext to terminate its relationship with the contractor, independent of the state of actual performance under the contract. The court characterized Schlesinger's performance shortcomings as merely a "technical default" or "bare default," *id.* at 707, 708, and emphasized the Navy's total failure to consider the level of performance once it found a means for terminating by default. *See, e.g., id.* at 708 ("[T]he Navy acted as if it had no option but to terminate for default ... once the mere fact of non-delivery was found."). In *Schlesinger,* it was improper for the Navy to terminate the contractor for default due solely to pressure from a congressional oversight committee because

this ground for termination was totally unrelated to contract performance.

■ In short, *Schlesinger* bars only a termination for default in which there is no considered *nexus* between the default termination and the contractor's performance under the contract. A second case relied upon by Contractors, *John A. Johnson Contracting Corp. v. United States,* 132 Ct.Cl. 645, 132 F.Supp. 698 (1955), also supports this rule. In *Johnson,* the plaintiff contractor failed to complete construction for Army hospital buildings in a timely fashion because of bad weather that had rendered certain construction roads unusable. The construction roads had previously been contracted out to a different contractor. *See id.* at 699–700. After numerous delays, the contracting officer determined that both the roads and buildings should be completed by a single contractor, and therefore decided to terminate the plaintiff's contract. Although the contracting officer intended to terminate the plaintiff's contract for convenience, he ultimately terminated the contract for default because government lawyers informed him that a nondefault termination would create legal problems. *See id.* at 705. Because the *Johnson* court found that the contracting officer had already decided to terminate the plaintiff for convenience, it held that the change to a termination for default "did not represent [the contracting officer's] judgment as to the merits of the case." *Id.* Indeed, because the court found, as a factual matter, that the plaintiff could not be held at fault for the unforeseen conditions, *see id.* at 703–04, there could be no proper nexus between a termination for default and the plaintiff's performance.

A third case cited to us by Contractors, *Darwin Construction Co. v. United States,* 811 F.2d 593 (Fed.Cir.1987), further confirms the rule identified above. In *Darwin,* we adopted the Armed Services Board of Contract Appeals's finding that "the default action was taken solely to rid the Navy of having to deal with Darwin." *Id.* at 596 (internal quotation marks omit-

ted). Thus, we held that the government used Darwin's technical default as a mere pretext for terminating the contract on grounds unrelated to performance. *See id.* Furthermore, *Darwin* clarifies what is meant by the "reasonable discretion" test used in *Schlesinger* and *Johnson.* In *Darwin,* we stated that, although a contracting officer has discretion with respect to contract termination, a termination for default will be set aside if it is arbitrary or capricious, or constitutes an abuse of the contracting officer's discretion. *See id.* at 598. When there is no nexus between the decision to terminate for default and contract performance, as was true in *Darwin, Schlesinger,* and *Johnson,* the termination for default may be arbitrary and capricious and set aside in favor of a termination for convenience.

■ Properly understood, then, *Schlesinger* and its progeny merely stand for the proposition that a termination for default that is unrelated to contract performance is arbitrary and capricious, and thus an abuse of the contracting officer's discretion. This proposition itself is but part of the well established law governing abuse of discretion by a contracting official. *See, e.g., United States Fidelity & Guaranty Co. v. United States,* 230 Ct.Cl. 355, 676 F.2d 622, 630 (1982) (listing four factors to be used in determining if conduct by a government official is arbitrary and capricious: (1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation).

**B**

■ The record shows that the government's default termination was not pretextual or unrelated to Contractors' alleged inability to fulfill their obligations under the contract. Therefore, unlike the cases cited above, the government's decision to terminate the A–12 FSD Contract for de-

fault was related to contract performance, and the Court of Federal Claims erred by converting the termination into one for convenience without first addressing the question of breach.

First, the trial court interpreted the Navy's actions prior to termination to evince a desire *not* to terminate the A–12 program for default, but rather to continue the contract. *See McDonnell Douglas IV,* 35 Fed. Cl. at 370. For example, the trial court noted that the government had overlooked Contractors' alleged default for several months, had unilaterally modified the contract to excuse the missed delivery date for the first aircraft, and had determined that even though the aircraft would be overweight, it would still meet operational requirements. *See id.* at 370, 373–74. Moreover, the trial court noted that the Navy "did not contemplate issuing a cure notice in December [1990]" and "did not believe the contractors' performance justified termination." *Id.* at 370.

■ The trial court's factual findings do in fact establish that the Navy did not want to terminate the A–12 program. Instead, at all times up until the very end, the Navy hoped to preserve the program and its A–12 aircraft. That is not to say, however, that Contractors were not in default under the contract, or that the government did not have the right to terminate the contract for default. A party to a contract, faced with a breach by the opposing party, can choose either to terminate the contract or to continue the contract, perhaps extracting other concessions or consideration from the breaching party in return for its willingness to modify the contract. *See, e.g.,* 3 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 7:36 (4th ed.1992). A party that chooses to proceed with the contract—even if it is the government, and even if it manifests a strong desire to procure the item that is the subject of the contract—does not thereby waive its right to terminate for default. Indeed, the trial court's finding that the Navy went to great lengths to preserve the A–12 program sug-

gests that it would not have terminated the contract but for its belief that Contractors had breached the contract or would not perform the contract.

More importantly, however, the record demonstrates that the government properly terminated the A–12 program for reasons related to contract performance. Admiral Morris, the contracting officer, testified at length about his decisional process that led to the termination for alleged default. He thought that he had three choices: to terminate for convenience, to terminate for default, or to do nothing. He rejected the latter as "irresponsible," thus focusing his attention on the other two choices. He eliminated the termination for convenience first, because he believed Contractors to be in material breach of the contract. This was so, in his words, because, as conceded in Contractors' response to the cure notice:

> They were in default because they acknowledged they would not be able to achieve the contract specifications and the contract requirements. Two, they had indicated that the would not be able to meet the delivery schedule that was currently in the contract. And three, they would not be able to perform the contract without extraordinary relief or additional funding for the contract. So they basically said they can't perform under the contract and they were in default of it.

Joint Appendix at 3,898–99. In further elaboration of his decision, again in the context of Contractors' response to the cure notice, Admiral Morris testified as to why he thought Contractors' default was material:

> They had failed to fabricate parts so as to endanger performance of the contract, and in my judgment, as would relate to the production options, failed to make progress, and it was clear to me that that is where they stood on the 7th of January when I terminated the contract for default.

*Id.* at 3,917. As to why a termination for convenience was inappropriate, Admiral Morris stated that:

> [B]ecause I felt very strongly that as a result of the contractors' default, it would be nothing short of unconscionable for me to put the burden of the contractors' failure to make progress and the contractors' failure to fabricate parts, so as to endanger performance of the contract, put that burden on the government and the taxpayer to reimburse all costs and to pay the contractors a profit for their failures.

*Id.* at 3,920. Therefore, Admiral Morris terminated the contract for failure to make progress and for failure to meet contract requirements.

 ■ Failure to meet contract specifications and inability to meet the contract delivery schedule are of course relevant considerations to whether a contractor is in default. *See Discount Co. v. United States,* 213 Ct.Cl. 567, 554 F.2d 435, 441 (1977) (inability to meet specifications); *Universal Fiberglass Corp. v. United States,* 210 Ct.Cl. 206, 537 F.2d 393, 398 (1976) (failure to meet schedule); *see generally* John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 929-35 (3d ed.1995) (discussing the requirements for a default termination based on failure to make progress); *id.* at 953-60 (discussing anticipatory repudiation by a contractor, such as "nonperformance and claims for payments or relief from matters as to which the contractor had assumed the risk").

 The trial court also found that Secretary Cheney denied extraordinary relief, which led to the termination, because of concerns about the A–12 program's "cost and schedule." *McDonnell Douglas IV,* 35 Fed. Cl. at 372. The cost to complete a contract—more particularly, the inability of a contractor to perform a contract at the specified contract price—and the ability to meet a contract schedule are both fundamental elements of government contracts and are related to contract performance;

as such, they are highly relevant to the question of default.

The government had specific concerns about when—and if—the A–12 aircraft would ever be delivered and how much it would cost. Secretary Cheney stated in testimony before Congress that the A–12 program was terminated because "no one could tell me how much the program was going to cost even just through the full-scale development phase or when it would be available. Data that had been presented at one point a few months ago turned out to be invalid and inaccurate." *Hearings on National Defense Authorization Act for Fiscal Years 1992 and 1993—H.R. 2100 and Oversight of Previously Authorized Programs Before the House Comm. on Armed Servs.,* 102nd Cong. 60 (1991) (statement of Richard Cheney, Secretary of Defense). The evidence in the record demonstrates that the Secretary of Defense denied relief under Pub.L. 85–804, and Admiral Morris chose to terminate the contract for default, for reasons related to Contractors' state of performance of the contract. The trial court emphasized that although Contractors failed to meet the aircraft weight limit, the Navy essentially waived this requirement because the overweight aircraft would still meet all operational requirements. *See McDonnell Douglas IV,* 35 Fed. Cl. at 363, 376. However, although that finding is relevant to the ultimate determination of whether Contractors were in breach, or whether a breach was excused, it is insufficient to show, in light of all the other evidence in the record, that the government terminated the contract for reasons wholly unrelated to contract performance.

We think it clear beyond any doubt that Admiral Morris, unlike the contracting officer in *Schlesinger,* or in other cases that have upset terminations for default for lack of nexus to contract performance behavior, made his choice for reasons related to contract performance. Admiral Morris certainly knew that Contractors took another view of events transpiring during

contract performance: although they admitted that they could not perform the contract according to its terms, they felt that the fault for their failure should be laid at the government's feet. Admiral Morris meant not to take away the right of Contractors to assert their defenses to termination for default, he instead only meant to assert the government's right to allege material breach on the record of contract performance that had been laid before him by Contractors themselves. Given the reasons stated for the action taken by the contracting officer in this case, it was legal error for the trial court to see these facts as commanding conversion of the termination for default into one for the convenience of the government.

To summarize, the government may not use default as a pretext for terminating a contract for reasons unrelated to performance; instead, there must be a nexus between the government's decision to terminate for default and the contractor's performance. The record and the facts found by the trial court establish that the government denied additional funding for the A–12 program and terminated the contract for default because of concerns about contract specifications, contract schedule, and price—factors that are fundamental elements of contract performance. Therefore, the trial court erred by vacating the termination for default without first determining whether a default existed. On remand, if the government can establish that Contractors were in default, then the termination for default would be valid. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987) (holding that the government bears the burden of proof with respect to the issue of whether termination for default was justified). Conversely, if the government is not able to make this showing, then the default termination was invalid and Contractors would be entitled to a suitable recovery, presumably under a termination for convenience theory.

## III

We turn next to the government's argument that the trial court erred in refusing to apply a loss ratio to Contractor's termination for convenience recovery, and the trial court's related treatment of Contractors' claims under the superior knowledge theory and for reasonable profits. In government contracts law, under certain circumstances the government owes a duty to disclose critical information to a contractor that is necessary to prevent the contractor from unknowingly pursuing "a ruinous course of action." *Helene Curtis Indus., Inc. v. United States*, 160 Ct.Cl. 437, 312 F.2d 774, 778 (1963). This doctrine of superior knowledge is well established in law, *see, e.g., Hardeman–Monier–Hutcherson v. United States*, 198 Ct.Cl. 472, 458 F.2d 1364, 1371–72 (1972); *Helene Curtis Indus.*, 312 F.2d at 778 & n. 1, and failure to disclose crucial information can lead to a finding of contract breach by the government, *see, e.g., GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed.Cir.1991). In this case, the government resisted Contractors' superior knowledge claims on the ground that the government could not have an implied duty to reveal classified information pertinent to the A–12 program that would threaten national security. The trial court denied the government's motion to dismiss the superior knowledge claims on the pleadings and allowed Contractors limited discovery. *See McDonnell Douglas V*, 37 Fed. Cl. at 275–76.

After a series of security breaches and discovery abuses, the trial court concluded that it could not litigate further the related issues of loss adjustment, superior knowledge, and reasonable profits. *See id.* at 272, 276–78. Contractors do not directly appeal this ruling; they contend only that if we upset the trial court's decision on loss adjustment, a remand of all three is appropriate. The government argues that Contractors' superior knowledge and reasonable profits claims were properly removed from litigation because they jeopardized state secrets, but that its loss adjustment

claim could be litigated without this danger and should have been allowed to proceed. Because we conclude that the trial court erred in converting the government's default termination of the A–12 FSD Contract to a termination for convenience, whether a loss adjustment applies to termination for convenience damages is not ripe for our decision. Because of the passage of time and of possible intervening developments, we are in no position to judge whether the risk of disclosure of state secrets will preclude adjudication, on remand, of Contractors' superior knowledge claim, and the issues of loss adjustment and reasonable profit. We think the trial court must be free to adjudicate the government's defense of its termination for default in the manner most fair and just to the parties. The trial court thus is free to reconsider this issue on remand. We express no view on the trial court's previous ruling on whether these three interrelated issues may be litigated.

IV

Turning finally to Contractors' cross-appeal, we consider whether the nature of the A–12 contract as a fixed-price, incrementally-funded contract affects the government's ability to terminate the contract. Contractors first argue that the government cannot apply a loss adjustment factor, based on the estimated cost of completing the contract, to Contractor's recovery under a termination for convenience because the government was not obligated to fund the contract to completion. Because we reverse the trial court's conversion of the default termination to a termination for convenience, we do not address this point.

■■■ Contractors similarly argue that the government cannot legally terminate the A–12 FSD Contract for failure to make progress toward work that the government was not obligated to fund, and which it in fact did not fund in full. Contractors argue that because the government limited its potential liability to Contractors through the incremental funding arrangement, see A–12 FSD Contract, ¶ H–7(c),

Joint Appendix at 15,073, there was no mutuality of obligation for the full FSD contract, and the contract was only valid to the extent of the funds already obligated. Under Contractors' theory, it follows that the government could not terminate the contract for failure to make progress toward work that they were not legally obligated to perform. In essence, Contractors assert that the government was precluded from terminating them for default due to failure to make progress toward the completion of the A–12 contract, unless and until the government had funded the contract in full.

We reject Contractors' arguments, however, for the following reasons. First, the A–12 FSD Contract explicitly recites the grounds upon which the government may terminate the contract for default, which grounds include Contractors' failure to make progress. See 48 C.F.R. § 52.249–9(a)(1)(ii) (1984); A–12 FSD Contract § I ¶ I, Joint Appendix at 15,251 (incorporating FAR 52.249–9). Contractors agreed to installment funding of the contract because the government could not obligate the full ceiling price at the time of contracting. See id. § H–7(a), Joint Appendix at 15,072. In order to comply with the Anti–Deficiency Act, see 31 U.S.C. § 1341(a) (prohibiting expenditures, obligations, and contracts exceeding appropriations), the parties specified that the government's total obligation, including termination costs, would never exceed the amount obligated at the time of termination. See A–12 FSD Contract § H–7(c), Joint Appendix at 15,-073. In return, Contractors were not required at any time to incur costs in excess of the total obligated amount. See id. § H–7(b), Joint Appendix at 15,072. Despite this funding arrangement, however, the parties agreed that the government had the right to "terminate this contract in whole or in part if the Contractor fails to ... [p]rosecute the work so as to endanger performance of this contract." 48 C.F.R. § 52.249–9(a)(1)(ii) (1984). Therefore, installment funding

did not contractually manifest itself as a condition to Contractors' performance; it merely stated a term characterizing the performance of the government. Moreover, the terms of the contract make clear that failure to make progress was a valid basis for default termination.

Second, we disagree with Contractors regarding their obligations under the A–12 FSD Contract. Contractors emphasize that, because of the incremental funding, there has never been a binding contract for completion of full FSD performance. Contractors acknowledge that the government could have default terminated the contract for failure to meet specific requirements associated with a particular installment of funding, but assert that failure to meet such specific requirements constitutes the *only* basis for a valid default termination. Because the contract did not link any specific objectives to a particular level of funding, Contractors argue, there was no basis for a default termination. We agree with Contractors that, at the time of termination, they were not obligated to *complete* all contract requirements. That does not mean, however, that Contractors did not have any obligations with respect to the full FSD requirements. As we noted above, the A–12 FSD Contract recites failure to make progress as a basis for contractor default and contract termination. *See* 48 C.F.R. § 52.249–9(a)(1)(ii) (1984). Therefore, Contractors' assertion that failure to meet contract requirements that are linked to already-funded work is the sole basis for default is simply incorrect. Failure to satisfy such requirements forms a ground for default under 48 C.F.R. § 52.249–9(a)(1)(i) (stating that the government may terminate a contract for default if the contractor fails to "[p]erform the work under the contract within the time specified in this contract or any extension"). Subsection (a)(1)(ii), in contrast, provides a separate basis for default: it obligates Contractors to make enough progress so that contract performance is not endangered. *See Universal Fiberglass Corp.*, 537 F.2d at 398 (Ct.Cl.1976) ("Failure to make progress is obviously some-

thing different from failure to deliver, or else the default clause would not provide separately for both."). The A–12 FSD Contract makes clear that this is a continuing obligation that exists even though the contract has not yet been funded to completion.

Third, the authorities cited by Contractors fail to establish that they were under no contractual duty to make progress. Contractors rely heavily on an internal government memorandum prepared by the Defense Department's Contract Finance Committee to support their proposition that a fixed-price incrementally funded contract imposes no obligations on a contractor beyond those associated with funding that has already been provided. The memorandum expresses the committee's view that:

> [I]f incremental funding is used, the contractor cannot be required to expend any effort beyond the Government's limitation of obligation. Failure to provide additional funding increments not only results in contract termination, but also makes it necessary to define, after the fact, what part of the effort should have been completed for the amount of funding actually provided. Since this division was apparently not possible in the first place, the contract, for all practical purposes, is converted to a best effort cost-type vehicle; the Government gets whatever the contractor was able to complete with the money provided.... Any advantages gained from use of a fixed price R & D contract are at risk until that point when incremental funding is replaced with full funding.

Memorandum from Chairman, Department of Defense Contract Finance Committee, to Director, DAR Council ¶ 3(c) (June 5, 1992), Joint Appendix at 68,695 (emphasis added). Setting aside questions about the legal significance of this memorandum, we conclude that Contractors' duty to make progress toward completing the A–12 FSD contract is consistent with the views expressed in the memorandum.

Unlike the obligation to complete performance, which arises only when the contract has been fully funded, Contractors' duty to make progress is a continuing obligation associated with each payment installment, and thus is not an "effort beyond the Government's limitation of obligation." *Id.*

 .Having determined that Contractors were obligated to make enough progress such that contract performance was not endangered, we must now address what progress Contractors should have made, corresponding to the funding actually provided by the government, in order to avoid default for failure to make progress. We disagree with Contractors' argument that it is "not possible" to answer this question, and that the contract must be converted into a cost-reimbursement type contract. *Id.* In litigation over a contractor's failure to make progress—unlike a dispute over failure to meet a specific contract requirement or schedule—courts must always determine *ex post* the threshold of performance that a contractor must meet to avoid. endangering performance of a contract. *See* Cibinic & Nash, Administration of Government Contracts 930–32 (tracing the evolution of the test applied by courts for failure to make progress). The same is true in this case.

Contractors rely on *Electronics of Austin,* ASBCA No. 24,912, 86–3 BCA ¶ 19,307 (1986), for the proposition that they were under no duty to make progress. In that case, the Board of Contract Appeals found that the government had waived the original contract performance schedule and therefore "there was no time frame within which [the plaintiff] had to perform." *Id.* at 97,631. Because there was "no time frame" at all for performance, the Board held that the plaintiff could not be guilty of failing to make progress. *Id.* In the instant case, however, there was a specified delivery schedule, including the delivery of the first FSD aircraft in December 1991. *See* A–12 FSD Contract § F, Joint Appendix at 15,049 (initial delivery schedule for the eight FSD aircraft); Contract Modification P00046 ¶ 1(b), Joint Appendix at

15,657 (Aug. 17, 1990) (revised delivery schedule). Therefore, the contract imposed a duty on Contractors to make such progress so as not to endanger performance as long as the contract was in place, that is, as long as the contract was being funded. *See* 48 C.F.R. § 52.249–9(a)(1)(ii) (1984). Consequently, Contractors' protestations to the contrary, we do not "view the contract that existed prior to full funding as embodying the 'ultimate end item' of the full FSED effort." Reply brief of Plaintiffs–Cross Appellants at 6. Instead, we hold only that the contract, throughout its term, embodied a duty to make progress toward the ultimate end item.

The question of whether Contractors satisfied their duty is of course that of breach, and must be determined by taking into account all of the relevant facts and testimony, such as Contractors' statements that they could not meet the contract specifications, the contract delivery schedule, nor complete performance at the specified contract price. *See supra* Part II.B. We leave it to the trial court to resolve these issues in the first instance.

## CONCLUSION

We reverse the trial court's ruling that the government's default termination of the A–12 FSD Contract must be converted into a termination for convenience because the government did not exercise the necessary discretion. Of course, we do not hold today that the government's default termination is justified. As Contractors correctly point out, they have never been found to be in default of the contract. Because the trial court focused on the legitimacy of the government's default termination decision, rather than on whether Contractors were in fact in default, the parties have not yet been afforded the opportunity to fully litigate default. *See McDonnell Douglas Corp. and General Dynamics Corp. v. United States,* No. 91–1204C, slip op. at 2 (Fed. Cl. June 17, 1993). If the government fails to establish at trial that Contractors were in default

under the contract, then the government's default termination would be improper and Contractors could rightfully recover damages under the theory of a termination for convenience. We vacate the trial court's ruling that the government's loss adjustment claim and Contractors' superior knowledge claim and claim for profits may not be litigated. Finally, we reject Contractors' argument that the incremental funding found in the A–12 FSD Contract precludes the government from terminating the contract for failure to make progress.

*REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.*